

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 30, 2018**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BAERG REAL PROPERTY TRUST, | § | Case No.: 16-33793-BJH-11 |
| | § | |
| Debtor. | § | |
| | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ |
| | § | |
| BAERG REAL PROPERTY TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 16-03160 |
| | § | |
| GARLAND SOLUTION, LLC, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

**(Findings of Fact and Conclusions of Law)**

Commencing on September 25, 2017, and continuing on September 26–29, 2017, October 5–6,

2017, October 25–26, 2017, November 28, 2017, and December 1, 2017, the Court conducted a trial in the above-captioned adversary proceeding. Appearing at trial were counsel for Baerg Real Property Trust, counsel for Garland Solution, LLC, and other appearances as noted in the record. The Court has reviewed and considered the arguments of counsel, the parties' stipulations, the testimony of witnesses, the exhibits admitted into evidence at trial, and the documents and pleadings filed in connection with the adversary. Based upon the record, the Court now finds and concludes as follows, under Federal Rule of Civil Procedure 52, made applicable in the adversary by Federal Rule of Bankruptcy Procedure 7052.

## I.  Findings of Fact

### Parties

1.  Plaintiff and Debtor, Baerg Real Property Trust (the "Baerg Trust"), is a California trust; Defendant, Garland Solution, LLC ("Garland Solution"), is a Texas limited liability company. The trustees of Baerg Trust are Hal Baerg and Kathy Baerg. Garland Solution's investors include James Ferrante, Veronica Saldivar, Jacqueline Hughes, and Alan Kuatt.

### The Earnest Money Contract

2.  The Baerg Trust and Garland Solution entered into an Earnest Money Contract ("Contract") on February 28, 2014. Ex. 1. The Contract provided that the Baerg Trust would sell to Garland Solution four apartment complexes in Dallas County, Texas, two located in Irving (known as "The Woods" and "Oakway Manor") and two located in Garland ("Lakeview" and "Lake Bluff") (collectively, the "Properties"). The Baerg Trust, owner of the Properties, had been negotiating their possible sale to Garland Solution since 2011. By 2014, the Properties were in need of renovations and rehab work, particularly the two Garland complexes.

3.  The purchase price under the Contract has four parts: (1) a cash portion of $1,616,577; (2) the payment of the outstanding principal and interest owed by Baerg Trust on the "Loans"—the

existing mortgage loans on the apartments owed by the Baerg Trust to M&T Realty Capital

Corporation ("M&T Realty"); (3) the satisfaction of the outstanding principal and interest *owed by*

*the Baerg Trust to Garland Solution* on the "Draw Down Promissory Note" in an amount "up to"

$898,500 that was issued on a construction loan made by Garland Solution to the Baerg Trust; and

(4) payment of the "Settlement Amount" in the amount of $90,000, which amount was owed under

a settlement agreement between the Baerg Trust and Garland Equity Fund, LLC that resolved a

lawsuit then pending in the Superior Court of Los Angeles.

4.    The mortgage with M&T Realty had a pre-payment penalty clause that, at the time of the

Contract, would have been triggered by an outright sale of the Properties.[1]  The parties therefore

structured the transaction so that Garland Solution could immediately begin the needed rehab work

on the Properties but then complete the acquisition of the Properties, with title passing, at a date past

the trigger date.  To help accommodate these goals, the Contract refers to, and is complemented by,

three escrow agreements referred to as Escrow I, Escrow II, and Escrow III that were set-up to

account for and manage the so-called escrow deposits from Garland Solution that were required by

the Contract.

5.    In addition to the escrow agreements, the transaction provided for the following additional

instruments between the parties, as defined by the Contract: a Construction Contract, a Loan

Agreement, a promissory note (the Draw Down Promissory Note referenced above), and a Purchase

and Sale Agreement.

6.    Under the Purchase and Sale Agreement, Garland Solution acquired a 1% beneficial interest

in the Baerg Trust for the sum of $25,000 ("Trust Interest").  Ex. Z.  The Trust Interest was

memorialized in a Memorandum of Beneficial Interest filed in the Dallas County Property Records

---

[1] The Loans with M&T Realty were apparently acquired by Fannie Mae.  For purposes of these findings and conclusions, the Court makes no distinction on whether M&T Realty or Fannie Mae is the present holder of the debt secured by the Properties.

on April 25, 2014. Ex. 18. Under Section 5.D.(6) (Covenants) of the Purchase and Sale Agreement for the 1% Trust Interest, Hal and Kathy Baerg could not resign or refuse to serve as Trustees. Ex. Z.

7. Class A Management, LLC was the Escrow Agent under the Contract. Class A Management is managed and solely owned by Cathy Fontana. Cathy Fontana, on behalf of Class A Management, also signed the various agreements on February 28, 2014, including the Contract, the Construction Contract, the Loan Agreement, and the escrow agreements for Escrow I, Escrow II, and Escrow III.

8. The Baerg Trust agreed, by the Construction Contract, that Class A Management was its designated agent (and the contractor) with authority to perform on behalf of the Baerg Trust its obligations and responsibilities under the Construction Contract.

9. Class A Management was also responsible for managing the Properties, paying the bills, and allocating the net positive cash flow from the Properties.

10. The four Properties were cross-collateralized to secure the Loans with M&T Realty; the Loans matured with a balloon payment due on July 1, 2016.

11. Upon the parties signing the Contract, Garland Solution began, in accordance with the Contract, overseeing the operations of the Properties and funding for the rehab and improvements provided by the Contract (via the Construction Contract and Loan Agreement).

12. The Contract was later amended with such amendment stated to be effective on February 28, 2014. Ex. 42. The amendment provides that if Garland Solution defaulted, the Baerg Trust, as seller, could choose the appropriate remedy, at its sole discretion, including termination of the Contract. *Id.* Under the Contract, as amended, if the Baerg Trust properly terminates the Contract, the outstanding principal balance and unpaid interest owed on the Draw Down Promissory Note is

forgiven. *Id.* And the balances in the Escrow I and Escrow II accounts are refunded to the Baerg Trust. *Id.*

13. To further facilitate the deal, in February 2014, Garland Solution and the Baerg Trust entered into a $100,000 working capital promissory note whereby Garland Solution made a loan to fund four bank accounts for each of the four Properties from which the then-outstanding payables were to be paid. Ex. X. The Properties' vendor debts were included on an exhibit to the Contract provided by Class A Management. Ex. 6.

14. The $100,000 unsecured promissory note was signed by the Baerg Trust as Maker on February 28, 2014. Ex. X. The interest rate on the note was 10% per annum and provides that it is due the earlier of July 1, 2016, or on the date of closing of the sale by the Baerg Trust to Garland Solution. *Id.* It provides that if closing occurs under the terms of the Contract, "then this Note shall be paid in full by Maker to Payee on the date of the Closing as a credit allocated by Payee on the closing statement(s) towards Payee's payment to Maker of the purchase price for one or more of the four (4) apartment complexes." *Id.*

15. The Contract and the other documents for the deal were prepared by Jim Ash, counsel for Garland Solution.

16. The Baerg Trust, by Hal Baerg, elected not to employ counsel to advise and assist it in negotiating and preparing the Contract. Hal Baerg is a sophisticated businessman who is experienced in commercial real estate deals. He had worked with lawyers before and was aware of the importance of having counsel.

### Closing Date under the Contract

17. Paragraph 5 of the Contract defines the closing date as follows: "Closing shall occur on or before thirty (30) days after the end of the Inspection Period . . . ." Ex. V at 8.

18. The Inspection Period "means the period commencing on the Effective Date and ending on the date Purchaser notifies Seller that all of Purchaser's Closing Conditions have been satisfied or waived." *Id*. at 3. The date of the Contract, February 28, 2014, is the defined Effective Date. *Id*. at 1. The Purchaser's Closing Conditions provide that closing is conditioned upon, as relevant here, the *occurrence* of the maturity date of the Loans, with the Loans being the outstanding Loans on the Properties with M&T Realty. *Id*. ¶ 14.C. The maturity date on the Loans was July 1, 2016.

19. The Inspection Period ended on the maturity date of the M&T Realty Loans, July 1, 2016; the outside date to close, therefore, was "on or before" thirty days *after* July 1, 2016.

**Garland Solution's Efforts to Close**

(a) <u>The Greystone Commitments</u>

20. In the late spring 2016, Jim Ferrante, for Garland Solution, contracted with a loan broker to assist Garland Solution in obtaining permanent financing for closing the deal per the Contract.

21. The broker arranged for potential financing through Greystone Commercial Lending ("Greystone"). Ferrante, for Garland Solution, completed loan applications with Greystone.

22. Greystone issued three loan commitments for "Fannie Mae" loans and also indicated that it would approve a "bridge" loan for the Lake Bluff complex. Fannie Mae, the Federal National Mortgage Association, would acquire the loans for, presumably, ultimate securitization. And the three Fannie Mae loans, if approved, would be serviced through Greystone, as Greystone is a "DUS," a Delegated Underwriting and Servicing Lender, with Fannie Mae.

23. In particular, the loan commitments were issued by Greystone on June 22, 2016, and June 24, 2016, for three of the four properties. Ex. 217. The commitments reflected loan amounts sufficient for closing of the sale under the terms of the Contract. They *did not* reflect a refinancing of the Baerg Trust's existing debt with M&T Realty. They do, however, contemplate loans with

6

newly established limited liability companies and were thus broken-out into three separate loans
made to the LLCs, respectively.  The commitments further recite that

> Greystone will obtain a Fannie Mae DUS Delivery Commitment (the "Fannie Mae
> Contract") . . . which will . . . enable the Loan to be sold and delivered to Fannie Mae.
> Satisfaction by the Borrower of all applicable requirements, terms and conditions of
> Fannie Mae and of this commitment <u>does not</u> guarantee that Fannie Mae will issue the
> Fannie Mae Contract. Greystone's obligation to make the Loan is expressly subject to
> obtaining the Fannie Mae Contract.

*Id*. (emphasis in original).

24. For each of the Greystone commitments, Greystone recites that the commitments were
issued for "a first mortgage loan" and that each loan "will be closed and funded by Greystone under
the Fannie Mae Small Mortgage Loan Delegated Underwriting and Servicing ('DUS') Product
Line." *Id*.  They further provide that upon receipt of Fannie Mae's commitment, the loan can then
be "sold and delivered to Fannie Mae." *Id*.

25. The Greystone loan commitments were sent by Justin Kantrowitz of Greystone to Eric
Stewart, the loan broker, on June 24, 2016.  Ex. 94.  The three final loans were conditioned on
receipt and confirmation of the existing loan-payoff amounts.

26. A fourth loan, for Lake Bluff, was to be a bridge loan issued by Greystone, as well.  The
Baergs were told on June 27, 2016, by Scott Henderson, the real estate broker, that a bridge loan
would be issued for Lake Bluff.  Ex. 95.

27. Greystone proposed that the deal be pitched to Fannie Mae as a "partnership buy-out."  Ex.
220.  But the pitch also referenced Garland Solution's 1% Trust Interest (rather than a much larger
interest), the terms of the Contract, particularly the four parts of the "purchase price"—the "cash
portion" and the payment of the Loans.

(b) The June 24 Reconciliation of Funds Addendum

28. On June 24, 2016, Ferrante, for Garland Solution, sent a Reconciliation of Funds Addendum ("Addendum") to Hal and Kathy Baerg. Ex. YY. As explained in Ferrante's cover letter, the Addendum was to be added to the Contract and the Purchase and Sale Agreement, each dated February 28, 2014. The Addendum recites that it was needed to "facilitate a refinance" of the Properties. *Id.*

29. The proposed parties to the Addendum were the Baerg Trust, as seller, and four limited liability companies—Oakway Manor Apartments LLC, Ray Hubbard Ranch I Apartments LLC, Ray Hubbard Ranch II Apartments LLC, and Woods of Irving LLC—as "Purchasers." The defined Properties were the four properties subject of the Contract. The Addendum refers to "Monies Paid . . . by Purchaser" and to the "Equity Infusion by Purchasers." *Id.* The Addendum recites that the $485,000 earnest money deposit had been paid and thus credited against the purchase price, as required by the Contract. It reflects a so-called "Equity Infusion" by Purchasers of $1,415,218 that represents the "capital put into the Properties by Purchaser from the time of execution of the Earnest Money Contract . . . in the form of capital improvements and construction upgrades on the Properties." *Id.* It provides a breakdown of the equity infusion for each of the four properties and recites that the monies to be paid at closing include the estimated payoff of $5 million to M&T Realty, the lienholder against the Properties, with such funds coming from the "proceeds of the Refinance Loan." *Id.*

30. The Addendum recites that the Baerg Trust, by signing the Addendum, confirms its receipt of the $485,000, agrees that the $1,131,577 and the $108,328 are sufficient to "purchase the Trust's remaining position and interest in the Properties and the Trust accepts said amounts as sufficient consideration for the buyout of its respective interests and positions in the Properties." *Id.* By signing the Addendum, the Baerg Trust confirms that after payment "it will have no further interest

or position with respect to the Properties . . . . The Properties thereafter will be retitled in the name of the respective Companies. The interests of Garland Solution LLC under the Earnest Money Contract and Purchase and Sale Agreement are hereby transferred to the Companies." *Id.*

31. Ferrante's cover letter explains that the Addendum was required to satisfy "lender guidelines." *Id.* He states that the lender requested that the Properties be purchased under four limited liability companies instead of just Garland Solution as a way to avoid cross-collateralization of the loans, to avoid overcollateralization, to ensure that each property is held by a "single purpose entity," and to build-in "liability protection." *Id.*

32. The Addendum is consistent with Ferrante's advice to the other investors in early June 2016. *See* Ex. PP.

33. On June 27, 2016, in-house counsel for Greystone sent an email to Scott O'Brien pointing out the problem with the Addendum not being between the Baerg Trust and Garland Solution, the purchaser under the Contract and the Purchase and Sale Agreement. Ex. 98.

34. The Addendum was amended on July 5, 2016, to provide that the title company for closing was to be changed from First Western Title Co. to Fidelity National Title. It also provided that the interest accrual due at closing was $135,410.

35. The same investors, Ferrante and the other members of Garland Solution, were to be the members of the four single-purpose-entity limited liability companies.

(c) Fannie Mae Commitments

36. Fannie Mae issued loan commitments for the financing of three of the Properties on June 30, 2016 and July 6, 2016. Ex. 222. By these commitments, Greystone is the designated "Fannie Mae Seller"; the commitments are for $1,700,000, $1,475,000, and $3,000,000, respectively. *Id.* These sums match the loan commitments issued by Greystone. *See* Ex. 217.

### The Baerg Trust Scuttles Closing

37. On June 24, 2016, Ferrante, on behalf of Garland Solution, contacted the Baergs to finalize items needed for closing.  Ex. YY.

38. On June 27, 2016, in anticipation of closing, Ferrante deposited $61,750 with Greystone to rate-lock the loans, and the loans were thus rate-locked.

39. The parties had a conference call on June 28, 2016.  During the call, Hal Baerg explained that he did not want to sign the Addendum and complete the transaction because of his potential liability to the IRS for capital gains taxes due from depreciation he took on the Properties over past years.  Baerg stated he would be left with nothing if he closed.  Baerg did *not* mention any issue of the characterization of the Greystone loan or the Addendum's description of the loan as a "refinance."

40. The Baerg Trust did not approve and sign the proposed Addendum.

41. On Friday, July 1, 2016, Mr. Baerg and his (and the Baerg Trust's) attorney, Brian Ballo, contacted Garland Solution's attorneys for the first time.  In particular, Ballo sent a letter on July 1 alleging that Garland Solution had breached the Contract by failing to close by July 1, 2016, and that it had 10 days (through July 10, 2016) to perform under the Contract.  Ex. 117.

42. Ballo listed various complaints in the July 1 letter regarding the structure of the transaction and Class A Management's accounting; he alleged issues that the Baergs had with the documents they signed for the transaction back in February 2014.

43. The letter complained about a need for an accounting of monies spent on the Properties and an accounting of rental proceeds, all of which were handled by Class A Management.  It complained that Ash was not acting as the escrow title agent.  The Contract documents initially designated Ash as the "Title Escrow Agent."  (Ash was attending his son's wedding in Virginia on June 25, 2016, and remained out of town to visit with his son, who was home on leave from his

military service in Afghanistan.  For these reasons, and upon Garland Solution's request, Ash had

withdrawn from handling the closing.)

44. The characterization of Garland Solution's loan with Greystone as a "refinance" was not

mentioned in the July 1 letter.

45. The parties and counsel held a conference call on July 12, 2016.  Garland Solution's counsel

reiterated that they were ready to close the following day.  Ballo responded by stating that Hal

Baerg would not be moving forward and confirmed in an email that same day that "Seller is Not

Proceeding with Any Transaction."  Ex. 151.

46. Ballo instructed Cathy Fontana not to disburse any cash flow from the Properties to Garland

Solution, and then Hal Baerg told Cathy Fontana to remove Garland Solution from view access to

all operating accounts.  She then terminated Garland Solution's view access to bank accounts and

removed Garland Solution's view access to the property management software, ResMan.

47. Unbeknownst to Garland Solution, Ballo had been retained prior to July 1, 2016, and had

written a demand letter on June 6, 2016, to Class A Management, complaining that Class A

Management had not provided an accounting under the Construction Contract and demanded that it

do so.  Ex. 71.

48. Ballo also *drafted* a demand letter dated June 16, 2016, to Garland Solution that Garland

Solution never received.  Ex. 82.  This letter claimed that Garland Solution had failed to keep the

Baerg Trust informed about Garland Solution's "status and activities" regarding the Properties.  *Id.*

It also demanded that Garland Solution provide "proof of liquid funds" or Garland Solution would

be in "anticipatory breach" on June 24, 2016, an arbitrary date selected by the Baergs.  *Id.*  The

letter ended by stating that Baerg would waive the "default" of Garland Solution and that he was

interested, due to the appreciation of the Properties, in "discussing a way that it could become a

'partner' with Garland" in a "new Joint Venture Together."  *Id.*

11

49. The letter reflects Hal Baerg's intentions and motivations for delaying and ultimately refusing to close.

50.  Notwithstanding that Greystone and Fannie Mae had approved three loans to Garland Solution to thereby allow Garland Solution to close the sale on three of the four Properties, and that plans were being made to obtain a bridge loan on the fourth property, the Baerg Trust elected to prematurely declare that the Contract was terminated prior to the outside closing date provided by the Contract.

51. Garland Solution had until at least July 30, 2016 to close; despite this, they were attempting to close well before July 30th but were foreclosed from closing by the Baerg Trust's failure to cooperate and asserted-termination of the Contract.

**The Escrow Accounts—Escrow I, Escrow II, and Escrow III**

52. Section 3.B.1 of the Contract states as follows:

> Purchaser shall deposit from the Second Deposit Sixty-Five Thousand and No/100 Dollars ($65,000.00) of the Earnest Money into Escrow I Account after which Escrow Agent shall ensure that the Escrow I Account maintains a minimum balance (the "Minimum Balance") equal to the lesser of (a) one (1) month of required debt service payments for the Loans, or (b) the sum of the total debt service payments due on the Loans prior to maturity of the Loans.

Ex. 1 at 5.

53. Section 3.B.1 of the Contract states, "[a]fter the Effective Date each required total monthly debt service payment for the Loans shall be paid directly by the Escrow Agent to the Lender from Escrow I Account." *Id*.

54. Section 3.B.1 of the Contract states, "[t]he Monthly Net Positive Cash Flow from each Property shall be deposited by Class A Management into the Escrow I Account promptly after its calculation." *Id*.

55. Section 3.B.1 of the Contract states, "[i]f Monthly Net Positive Cash Flow from the Properties is insufficient to maintain the Minimum Balance in Escrow I Account, Escrow Agent

shall transfer the amount of funds from Escrow II Account to Escrow I Account as necessary to maintain the Minimum Balance in Escrow I Account." *Id*.

56. Section 3 of the Escrow III Agreement states, "Escrow Agent shall disburse from the Escrow III Account the payments for work performed by Contractor on the Properties and approved in writing by Escrow Agent as prescribed in the Construction Contract and in the Loan Agreement." Ex. 10.

57. Under the Contract, Class A Management was, as stated, the Escrow Agent for the escrow accounts. But Ferrante of Garland Solution generally directed Class A Management's handling of the escrow accounts and did so for the two-plus years after the Contract was signed. The Baergs, for the Baerg Trust, lived in California and took no real interest in the management of the Properties. They knew and effectively approved of Class A Management's and Garland Solution's involvement.

58. Escrow I was opened on May 23, 2014, with a deposit of $65,000. Ex. 132.

59. Garland Solution deposited $65,000 as required into Escrow I and $285,000 as required into Escrow II. And Garland Solution deposited a total of $485,000 into Escrow II.

60. The funds in the Escrow II account were used to pay the $70,000 balance owed to a third party on the settlement agreement—as provided by the Contract. Ex. 132.

61. The funds in the Escrow II account were also used, as directed by Hal Baerg, to pay Scott Henderson's broker fee of $100,000 and to pay $51,092 to Mr. Baerg's church, Capo Beach Church. *Id*.

62. The required Minimum Balance was not maintained in Escrow I.

63. The Baerg Trust received $200,000 in the form of periodic $50,000 payments made by Garland Solution to the Baerg Trust, as provided by the Contract. *Id*.

64. By the Contract, Garland Solution was required to make total escrow payments of $550,000, which it did.  Of this sum, $450,000 was, during the term of the Contract, to be paid to the Baerg Trust.  This was also done, though the timing of such payments may not have been made as provided by the Contract.  Of the $100,000 difference (between the $550,000 total escrow deposits and the $450,000 of the escrow that went to the Baerg Trust), $65,000 was deposited into Escrow I, *again* as required by the Contract.

65. The Contract provided that the net cash flows from the Properties, as defined, were to be deposited into Escrow I if needed to pay the debt service on the Properties.  And if an excess of funds in Escrow I over the M&T debt service, then such excess was to be used to pay on the Construction Loan.  Then if the Construction Loan was paid-off, any excess at closing would go to the Baerg Trust as partial payment of the Purchase Price.

66. The escrows did not build-up a sufficient amount to pay the Construction Loan and thus did not generate funds to apply to the Purchase Price.  The remaining $35,000 from Garland Solution's $550,000 escrow deposits is owing to the Baerg Trust.  (It is not clear from the evidence that such amount is presently held in Escrow II, as required.)

### Events Affecting the Properties Post-Contract and Pre-Closing

67. The Properties have significantly increased in value since February 28, 2014.

68. In December of 2015, the Properties in Garland sustained major tornado damage.

69. Class A Management, through Cathy Fontana, engaged Bo Fontana and his company, Millsworth Enterprises, Inc., to repair the Properties.  Bo Fontana is Cathy Fontana's son.

70. Kathy Baerg initially objected to Bo Fontana (for Millsworth) working on the Properties but later, reluctantly, approved employment of Millsworth for the repairs.  Garland Solution was not specifically authorized under the Construction Contract to engage a contractor to do repairs for the tornado damage.

71. On June 30, 2016, at 8:55 a.m., Bo Fontana/Millsworth filed two large mechanic's liens (over $700,000 total) in connection with claims related to tornado-repairs on the two Garland Properties.  Ex. 107.

## Events Leading to Bankruptcy Filing

72. The Baerg Trust sued Garland Solution immediately after declaring that the Contract was terminated.  It filed its Original Petition in Dallas County District Court against Garland Solution on July 18, 2016.  Ex. 166.  The petition alleged breach of contract, common law fraud, exemplary damages, unjust enrichment, money had and received, quiet title to real property, and declaratory judgment that the Contract was breached as a matter of law and no longer enforceable.  On July 21, 2016, the State Court Action was removed by Garland Solution to the United States District Court for the Northern District of Texas under Case No. 3:16-cv-02114-B.  Garland Solution subsequently filed a Counterclaim and an Application for a Receiver and Temporary Injunction.

73. On August 24, 2016, the District Court, Judge Boyle presiding, heard Garland Solution's Application for Temporary Restraining Order and Preliminary Injunction.  At the hearing, Hal Baerg testified that he had a three-month extension from M&T Realty.  The court granted relief that included: a) requiring Class A Management/the Baerg Trust to re-establish Garland Solution's access to bank accounts and records, b) limiting the Baergs' access to cash flow from the Properties, and c) requiring the Baergs to provide correspondence between the Baergs and M&T Realty regarding any attempts to forestall foreclosure or obtain a forbearance.

74. After discovering that the Baergs failed to provide updates, information, and correspondence with M&T Realty, Garland Solution filed a Motion for Contempt.  The court held a conference call and scheduled the Motion for Contempt for hearing on September 30, 2016, requiring that Hal and Kathy Baerg appear in person at the hearing to testify.

75. The Baerg Trust filed for chapter 11 bankruptcy protection on September 29, 2016.

76. The chapter 11 filing prevented the foreclosure sale of the properties by Fannie Mae (successor to M&T Realty on the Loans).

77. The Baerg Trust filed its Original Adversary Complaint against Garland Solution on December 9, 2016. Garland Solution filed its Answer and Counterclaim on January 11, 2017. The Baerg Trust filed its First Amended Adversary Complaint against Garland Solution on May 25, 2017. The parties agreed that the Bankruptcy Court has jurisdiction to resolve their disputes as they concern the property of the bankruptcy estate.

### The Bankruptcy Schedules

78. The Baerg Trust's bankruptcy schedules confirm that its bankruptcy case is basically a single-asset case. The Properties, the four apartment complexes, are listed with a current value of $17,501,000; it also has some cash, $400,000 in insurance proceeds to cover repairs at the Lake Bluff and Lakeview Village apartments. Fannie Mae is listed as its only secured creditor, secured by the Properties. (M&T Realty is also listed for notice purposes.) The total amount of Fannie Mae's claims, according to the schedules, against the Properties is $5,438,875.

79. The schedules reflect total unsecured claims of $761,478.70, but this amount includes the two Millsworth Enterprises claims of $662,603.17 and $76,516.29, respectively. These claims are, however, secured by the mechanic's liens that Millsworth filed against the Properties.[2] The balance of the unsecured claims are relatively small vendor claims that no doubt arose as a result of the timing of the filing rather than as a result of the Baerg Trust's inability to pay its debts as they came due.

---

[2] The Baerg Trust filed an amended Schedule D on October 5, 2017, which adds two *secured* claims from judgment liens that, according to the schedule, arose from unpaid invoices of Millsworth.

## II. <u>Conclusions of Law</u>

### Jurisdiction and Venue

1.  The Court has jurisdiction of this action under 28 U.S.C. §§ 1334(b) and 157(a) and the District Court's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc, adopted in this district on August 3, 1984.  The claims before the Court are core claims under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).  The parties have consented to the Court deciding all pending claims.  The Court has authority to enter a final judgment in this adversary proceeding.  28 U.S.C. § 157(b)(1) and (c)(2); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948–49 (2015).

2.  Venue is proper under 28 U.S.C. § 1409.

### Positions of the Parties

(a)  <u>Claims of the Baerg Trust</u>

3.  The Baerg Trust asserts causes of action for declaratory judgment, anticipatory breach of contract, breaches of contract—separately for the Contract and the escrow agreements—and attorney's fees.

4.  The declaratory judgment cause is brought under 28 U.S.C. § 2201(a) and asks that the Court determine that the Contract expired by its terms, was breached by Garland Solution, and, as a result, is no longer a valid and enforceable contract between the parties.  The Baerg Trust thus submits that the Contract is not subject to assumption or rejection.  The Baerg Trust further requests that the Court determine that it owes nothing to Garland Solution because of Garland Solution's failure to close the sale.

5.  For the anticipatory breach claim, the Baerg Trust submits that the June 24, 2016 Reconciliation of Funds Addendum constituted an anticipatory breach of the Contract because it proposed to change the nature of the deal.

6. The escrow agreements for each of Escrow I, Escrow II, and Escrow III were, according to the Baerg Trust, breached by Garland Solution's failure to maintain the accounts as required by the Contract and the respective escrow agreements.

7. The Baerg Trust asserts two breach of contract claims that directly concern the Contract: first, that Garland Solution breached the Contract "on multiple occasions, and in multiple ways, before . . . July 1, 2016," and, second, that Garland Solution breached the Contract by failing to close the sale "by the July 1, 2016 [d]eadline." First Amended Complaint [Doc. No. 33] at 8, 11.[3]

(b) Claims of Garland Solution

8. Garland Solution, as defendant, denies all relief requested by the Baerg Trust and asserts counterclaims for specific performance and declaratory relief, breach of the Contract, anticipatory breach of the Contract, and attorney's fees.

9. Garland Solution contends that it was prepared to proceed to closing but was unable to close because the Baerg Trust refused to close. For this, it seeks a declaratory judgment of the rights of the parties under the Contract and, in particular, a judgment against the Baerg Trust ordering its trustees, the Baergs, to deliver the Properties to Garland Solution. As part of such relief, it seeks the out-of-pocket costs, lost profits, and loss of the benefit of the bargain as a result of the Baerg Trust breaching the Contract.

10. Garland Solution states that the Baerg Trust anticipatorily breached the Contract by, on July 12, 2016, refusing to go forward under the Contract and by other actions of the Baerg Trust through its attorney, Ballo, that reflected the Baerg Trust's refusal to close.

---

[3] All "Doc. No." references are to the Court's docket sheet for the adversary proceeding unless otherwise indicated.

(c) The Pretrial Order

11. The causes of action of the parties and the particular forms of relief as alleged in the live pleadings were carried forward and alleged in the pretrial order approved by the Court.  Doc. No. 71.

## Partial Summary Judgment Granted

12. On September 21, 2017, the Court granted summary judgment for Garland Solution and against the Baerg Trust on Baerg Trust's causes that Garland Solution breached the escrow agreements of Escrow I and Escrow II and that Garland Solution anticipatorily breached the Contract by requesting that the Baerg Trust agree to the terms of the Reconciliation of Funds Addendum.  Though the Court determined that the Addendum was not an anticipatory breach of the Contract, the Court reserved for consideration whether Garland Solution's alleged attempt, by the Addendum, to recharacterize the deal—through the use of such terms as "refinance," "Equity Infusion," "Buyout," and amount "invested"—is relevant to the Baerg Trust's breach of contract claim generally.

## Garland Solution Did Not Breach the Contract

13. At trial, the Baerg Trust, through Hal Baerg, and its counsel repeatedly raised the point that the financing obtained by Garland Solution was termed a "refinance."  This, with the Addendum's reference to Garland Solution's "Equity Infusion" and "Buyout" of the Baerg Trust, was, according to the Baerg Trust, an improper attempt by Garland Solution to change the nature of the transaction. The Baerg Trust further argues that Garland Solution's request that the Baerg Trust approve the Addendum reveals Garland Solution's inability to obtain financing and thus proves that Garland Solution breached the Contract.  This is not the case, however.

14. The deal was unusually structured and intentionally so.  The structure, with the drawn-out period between the signing of the Contract and closing of the sale, achieved precisely what the

parties wanted. The reference to Garland Solution's equity infusion, for example, refers to its funding of the deal from inception through to pre-closing. From its perspective, it had built-up equity in the Properties, thus improving its position for obtaining loans for closing.

15. But the commitments issued by Greystone and by Fannie Mae did not require the Addendum and were not conditioned on a verification of any "Equity Infusion" by Garland Solution.

16. The Baerg Trust and the Baergs did not sign or approve the Addendum. They instead, through their attorney Ballo, complained about substituting the LLCs as purchasers and changing the escrow agent and title company. These were non-substantive changes. And Garland Solution attempted to address these issues by arranging a two-step closing, with Garland Solution as purchaser and then as assignor as to the LLCs. And to further assuage Hal Baerg and the Baerg Trust, it also proposed Jim Ash to return to the deal along with his title company, First Western Title.

17. The references by Garland Solution and Greystone to the proposed loan as a "refinance" do not change the substance of what would have transpired at closing. It was not a "refinance" as that term is commonly used. There was to be no modification to the existing loan between M&T Realty and the Baerg Trust. New funds would have been advanced by a new lender to a new borrower; the funds were to be used to pay-off the existing debt on the Properties. The Baerg Trust's obligation to M&T Realty would have thus satisfied the Baerg Trust and it would have had no further liability on the Properties. The Baerg Trust would have left closing with the cash due it under the Contract. And, per the Contract, the Baerg Trust was required to buy back the 1% Trust Interest that Garland Solution acquired at the time the Contract was entered into. The verbiage used by Garland Solution and Greystone does not change or affect the substance of the deal.

20

18. The evidence indicates that the deal would have timely closed as proposed with the main financing provided under the Greystone and Fannie Mae commitments. But the acts and conduct of the Baerg Trust, and Hal Baerg in particular, foreclosed Garland Solution's efforts to close the deal.

19. Garland Solution did not breach the Contract and did not anticipatorily breach or repudiate the Contract.

### The Baerg Trust Anticipatorily Breaches the Contract

20. The Closing Date was not a date certain under the Contract; Garland Solution had at least until July 30, 2016 to close under the Contract. *See* Findings 17 to 19. That closing could extend to July 30, 2016, and thus past the maturity of the Loans does not alter the plain meaning of the Contract. The additional costs of closing after the maturity of the Loans—the additional accrual of interest—would not have changed what the Baerg Trust was to receive at closing. It, instead, created an incentive for Garland Solution to close as soon as possible.

21. The Baerg Trust's July 1, 2016 notice of Garland Solution's alleged default was premature and was not a proper notice of default under the Contract. *See* Findings 37 to 51.

22. The Baerg Trust repudiated the Contract on July 12, 2016. *See* Finding 45.

23. The Baerg Trust failed to cooperate. Texas law does not favor implied covenants and, instead, construes contracts as written. *See Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (finding it necessary to look beyond the terms of the agreement only when necessary to effectuate the intent of the parties); *see also Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 770 (Tex. App.—Dallas 2005, pet. denied). "A duty to cooperate is implied in every contract in which cooperation is necessary for performance of

the contract." *Id*. Certain agreements here contain express provisions related to the duty to cooperate; the Contract does not, however.[4]

24. A duty to cooperate "requires that a party to a contract may not hinder, prevent, or interfere with another party's ability to perform its duties under the contract." *Id*. This is unlike the covenant of good faith and fair dealing, which the Texas Supreme Court explicitly rejected. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983). As the Fifth Circuit noted, a duty to cooperate implies that one party will not prevent the other party from performing the contract, and such duty "falls far short of implying a covenant of good faith and fair dealing." *Tex. Nat. Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 699 (5th Cir. 1989).

> An example may help to illustrate an implied promise not to hinder the other party's performance of the contract. Imagine that Vilardo Da Vinci and A.W. Warhol agree that Da Vinci will paint the interior walls of Warhol's house, including a fresco in the dining room, by one week hence. In return, Warhol agrees to create in day-glow colors a six-panel portrait of Da Vinci. The next afternoon, Da Vinci arrives at Warhol's door with his buckets, brushes, paint cans, and ladder in tow. Warhol glances out the window and sees Da Vinci. He waves and returns to his bowl of chicken soup.
>
> Da Vinci knocks on the door, looks through the window, and calls out "I am here ready to paint. Will you let me enter so that I might paint your walls?"
>
> After a few slurps from the bowl, Warhol says to Da Vinci, "No, not today. Come back tomorrow."
>
> Each day for a week this exchange occurs. Da Vinci then sends word to Warhol that he still expects Warhol to silk screen a portrait for him.
>
> When Warhol prevented Da Vinci from being able to perform his side of the bargain, Warhol breached the agreement. In accordance with their contract, Warhol must still silk-screen Da Vinci's portrait. Of course, an issue of anatomical exactitude still looms in any resolution of the Da Vinci-Warhol dispute.

*Id.* Implicit in the Contract, and expressly stated in the other agreements that are incorporated by reference by the Contract, is the Baerg Trust's promise to permit Garland Solution to perform under the Contract, that is, to make arrangements for and to actually close the deal.

---

[4] Ex. V. at 33 ¶ 15 (Escrow I Agreement); Ex. 4 ¶19 (Construction Contract); Ex. Y at 4 ¶ 15 (Escrow III Agreement); Ex. 9 at 3 ¶ 15 (Escrow II Agreement). The language used in these agreements is identical and reads as follows: "Duty to Cooperate. Each Party to this Agreement agrees to cooperate and fully perform any further acts, and to execute and deliver any documents which reasonably may be necessary to further and implement the provisions of this Agreement."

25. By failing to cooperate, and blocking Garland Solution's performance under the Contract, the Baerg Trust anticipatorily breached the contract.

26. Garland Solution is the prevailing and successful party under the Contract, paragraph 35, and the Baerg Trust is the unsuccessful party.

### The Remedy of Specific Performance of the Contract

27. As the remedy for the Baerg Trust breaching the Contract, Garland Solution asks that the Court direct the Baerg Trust to convey the Properties to Garland Solution per the terms of the Contract. Garland Solution seeks damages that are ancillary to the Baerg Trust's failure to close; such damages are not sought as an alternative to specific performance. *See* Garland Solution's Counterclaim [Doc. No. 35] ¶¶ 4.5, 4.6, 5.4, and 6.5; Joint Pretrial Order [Doc. No. 71]; Garland Solution's Response Brief [Doc. No. 75] at 8; Garland Solution's Proposed Findings of Fact and Conclusions of Law [Doc. No. 65] ¶¶ 19–27.

28. Garland Solution is entitled to specific performance of the Contract at a price to be determined that takes into account the ancillary damages caused by the Baerg Trust's breach.

29. The Baerg Trust, by its actions, refused to proceed to closing and treated the Contract as terminated well before its bankruptcy filing. The Contract might otherwise fit the definition of an executory contract on its face: if Garland Solution did not pay the Baerg Trust, it would constitute a material breach; and if the Baerg Trust did not sign and issue deeds to the Properties, the Baerg Trust would have materially breached. But Garland Solution, in good faith, attempted to comply with the Baerg Trust's demands and with the terms of the Contract to see that closing occurred. All that was left for Garland Solution to do was to pay the purchase price, which some courts have held makes a contract non-executory. *See In re Placid Oil Co.*, 72 B.R. 135, 138 (Bankr. N.D. Tex. 1987); *see also In re Cox*, 179 B.R. 495, 498 (Bankr. N.D. Tex. 1995) (holding that a contract is not executory if the only performance required by one side is payment).

30. The Contract was not included as an executory contract in the Baerg Trust's bankruptcy schedules filed with the Court. "[A] debtor is required to disclose assets, liabilities, and *executory contracts* on particularized schedules." *Noble Energy, Inc. v. ConocoPhillips Co.*, 532 S.W.3d 771, 787 (Tex. 2017) (emphasis added); 11 U.S.C. § 521(a)(1)(i); Fed. R. Bankr. P. 1007(b)(1)(C). *See also* Official Bankruptcy Form 6, Schedule G ("Describe *all* executory contracts of *any* nature and all unexpired leases of real or personal property [and] [s]tate nature of debtor's interest in contract, i.e., 'Purchaser,' 'Agent,' etc." (emphasis added)). Courts place an emphasis on the importance of filing schedules to ensure adequate information is available for all relevant parties. *In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005). The Contract was not disclosed in the Baerg Trust's Schedule G; the parties were not provided with adequate notice that the Contract was executory under § 365 and thus should not be treated as such.

31. The bankruptcy case was filed, principally, to avoid selling the Properties to Garland Solution.[5] Although the Bankruptcy Code contains no specific requirement that a chapter 11 petition must be filed in good faith, it is well established that good faith is an implied prerequisite to filing under chapter 11. *In re Baumgartner*, 57 B.R. 513, 515 (Bankr. N.D. Ohio 1986) (citing *In re Winn*, 43 B.R. 25, 28 (Bankr. M.D. Fla. 1984)); *In re Young*, 76 B.R. 376, 378 (Bankr. D. Del. 1987). To permit the debtor-in-possession to undo valid contracts whenever it alone might benefit would introduce much uncertainty into private bargaining and lead to abuse. *See generally In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011) (discussing the requirement that the business judgment rule applies to a debtor's "decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the [debtor's] decision was one taken in bad faith or in

---

[5] Baerg filed for bankruptcy the day before the hearing in the District Court on Garland Solution's Motion for Contempt.

gross abuse of the [debtor's] retained business discretion." (quoting *Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985))).[6]

32. The follow-on question is whether Garland Solution is entitled to specific performance when monetary damages are arguably available. For the reasons stated below, specific performance is the proper remedy, and the Court will require that the Baerg Trust convey the Properties.

33. Contract claims are generally governed by state law. In Texas, a breach of a contract for real property gives rise to specific performance. *Claflin v. Hillock Homes, Inc.*, 645 S.W.2d 629, 634 (Tex. App.—Austin 1983, writ ref'd n.r.e.). While specific performance may be available under state law, it is not routinely allowed against the trustee or debtor-in-possession.

34. State contract law generally defines a party's property rights while federal law determines how those rights are enforced in a bankruptcy case. *See generally Butner v. United States*, 440 U.S. 48, 55 (1979). An important example is the choice between damages and specific performance, which choice has potentially powerful distributional consequences and affects traditional objectives of a bankruptcy case; otherwise, state laws providing very broad rights to specific performance would have the inequitable effect of granting preferential treatment to certain contract creditors, to the detriment of all other general unsecured creditors in bankruptcy. *See id.* at 55 (recognizing that a federal interest sometimes requires a different result than what state law would provide); *In re TransAmerican Natural Gas Corp.*, 79 B.R. 663, 667 (Bankr. S.D. Tex. 1987) (rejected contract effectively would be enforced if court enforced liquidated damages clause).

35. The right to specific performance, unlike other equitable obligations, such as an injunction enforcing a covenant not to compete, generally gives rise to a "claim" that can be discharged in

---

[6] *See also In re Penn Traffic Co.*, 322 B.R. 63, 73–74 (Bankr. S.D.N.Y. 2005), *aff'd in part, rev'd in part and remanded*, No. 05 Civ. 3755(NRB), 2005 WL 2276879, at *1 (S.D.N.Y. Sept. 16, 2005) (holding that the debtors could not reject an agreement pursuant to § 365(a) as an executory contract when, among other things, the developer had fully performed except as prevented by debtors when they declined to accept developer's tender of performance).

bankruptcy. 11 U.S.C. § 101(5). *Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 85 (S.D.N.Y. 2012), *aff'd sub nom. In re Lyondell Chem. Co.*, 542 F. App'x 41 (2d Cir. 2013). *See also In re A.J. Lane & Co., Inc.*, 107 B.R. 435, 439 (Bankr. D. Mass. 1989) ("[R]ecognition of the doctrine and allowance of specific performance against a debtor in bankruptcy proceedings would be to prefer one creditor over others"). The policy rationale is that specific performance should not be permitted where the remedy would in effect do what § 365 of the Code can avoid, that is, the imposition of burdensome contracts on the debtor. *Id.* at 439 (right of specific performance is subordinate to debtor's rejection rights); *In re Waldron*, 36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance as a remedy resulting from the rejection of an executory contract under § 365.").

36. But these policy concerns are not an issue when, as here, there exists a largely two-party dispute rather than an array of creditors. The need to protect creditors from an unequal distribution of the estate does not exist, and enforcing an agreement that has already benefited the debtor does not "impose a burdensome contract" on the bankruptcy estate.

37. Upon closing of the sale to Garland Solution, creditors holding secured claims should be fully paid, and the Baerg Trust should have additional funds to pay its remaining claims in full or substantially in full.

38. Courts within the Fifth Circuit have not limited remedies for claims solely to monetary damages. For example, the court in *In re Independent American Real Estate,* 146 B.R. 546 (Bankr. N.D. Tex. 1992), permitted the non-debtor party to enforce a liquidated damages clause resulting from the rejection of the agreements because such liquidated damages clauses were authorized under state law. *Id.* at 553–54. The court noted that "in making the determination under § 502 as to the extent of the claim to be allowed, the [c]ourt must go beyond the Bankruptcy Code to the substantive state law governing the rejected contract." *Id.* at 553. "State law specifies the remedies

of a non-breaching party to a contract when the contract is breached, to the extent state law does not contravene the Bankruptcy Code." *Id.* (citing *Lindermuth v. Myers*, 84 B.R. 164, 166 (D.S.D. 1988); *In re Re-Trac Corp.*, 59 B.R. 251, 259 (Bankr. D. Minn. 1986); *In re Audra-John Corp.*, 140 B.R. 752, 757 (Bankr. D. Minn. 1992)). *See also Haber Oil Co. v. Swinehart* (*In re Haber Oil Co.*), 12 F.3d 426, 436 (5th Cir. 1994) (holding that the Code accords the beneficiary of a constructive trust, properly imposed under state law, the right to recover the trust property—rather than merely monetary damages—from the bankruptcy trustee or the debtor).

39. Specific performance may, therefore, be granted in a bankruptcy case if allowed under applicable state law. In Texas, specific performance is an equitable remedy that may be awarded for breach of contract, as a substitute for money damages when such damages would not be adequate. *In re Staley*, 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010). Specific performance is more readily available to enforce a contract involving real property than a contract involving personal property because land is regarded as unique and an action for damages is generally considered inadequate. *Simpson v. Green*, 231 S.W. 375, 380 (Tex. Comm'n App. 1921, judgm't adopted); *Scott v. Sebree*, 986 S.W.2d 364, 369–70 (Tex. App.—Austin 1999); *Milliken v. Townsend*, 16 S.W.2d 259, 260 (Tex. Comm'n App. 1929, judgm't affirmed). Although not a remedy that exists as a matter of a right, specific performance of a valid contract for the sale of realty is ordinarily granted where suit is based on such contract. *Kress v. Soules*, 152 Tex. 595, 597, 261 S.W.2d 703, 704 (1953); *Scott v. Sebree*, 986 S.W.2d 364, 370 (Tex. App.—Austin 1999).

40. A party requesting specific performance must plead and prove two things: "(1) compliance with the contract, including tender of performance, unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times." *Hogan v. Goldsmith*, 533 S.W.3d 921, 923–24 (Tex. App.—Eastland 2017, no pet.) (citing *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 601 (Tex. 2008)). If the party requesting performance meets this

burden, then the court may award the remedy "of requiring exact performance of a contract in the specific form in which it was made." *Id.* at 923; *see also McKinney/Pearl Rest. Partners v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 774 (N.D. Tex. 2017) ("a court has no power to decree specific performance in any manner except in keeping with the terms of the agreement made by the parties.") (quoting *Hubler v. Oshman*, 700 S.W.2d 694, 699 (Tex. App.—Corpus Christi 1985, no writ) (internal quotation omitted).[7] And the Court should not order specific performance if such remedy requires a party to perform a continuous series of acts and such order cannot be achieved without the need for constant court supervision. *See McKinney/Pearl Rest.*, 241 F. Supp. 3d at 774–75.

41. Factors that a court will consider when a party seeks specific performance are (i) the reasonableness of the contract, (ii) the fairness to the parties in requiring performance, and (iii) the hardships that each party will bear. *Gordin v. Shuler*, 704 S.W.2d 403, 408 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Kress v. Soules*, 152 Tex. 595, 261 S.W.2d 703, 704 (1953); *Bennett v. Copeland*, 149 Tex. 474, 235 S.W.2d 605, 609 (1951). A party sued for breach should not be able to avoid specific performance merely by establishing that it made a bad bargain; rather, it must show that enforcement of the Contract would be unconscionable. *Claflin v. Hillock Homes, Inc.*, 645 S.W.2d 629, 633 (Tex. App.—Austin 1983, writ ref'd n.r.e.).

42. These factors as applied here support the conclusion that Garland Solution is entitled to specific performance. The Contract terms were fair and reasonable to Garland Solution and the Baerg Trust at the time they entered into the Contract and its supporting agreements. The Contract, with its built-in two-plus year delay for closing, is unusual. And while its implementation was

---

[7] A contract that does not include a definite date or period of time for performance will not render specific performance unavailable. *See Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 486 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Where the other provisions of the contract are clear and the only uncertain term pertains to the time for performance, Texas law allows an inference of reasonable time. *See Melanson v. Navistar, Inc.*, No.3:13-CV-2018-D, 2014 WL 4375715, at *7 (N.D. Tex. Sept. 4, 2014).

challenging, it did reflect what the parties wanted at the time. Garland Solution provided adequate assurance throughout the course of the Contract term (from its signing to time of the anticipated closing) and even offered to pay the Baerg Trust additional interest on a portion of the purchase price when it had no obligation to do so. Garland Solution, in good faith, attempted to close. It invested substantial resources into improving the Properties; the Properties have appreciated in value. If specific performance is not ordered, Garland Solution will experience hardship to the extent that it will not realize from its investment the Properties' future revenues and enhanced value.

43. The Baerg Trust suffers no hardship with specific performance granted, as it will receive the benefit of its bargain—a price that was contemplated at the time to be fair and reasonable for both parties. Enforcing the Contract is not unfair and not unconscionable. The Baerg Trust prevented the sale from closing. It would be unfair to allow the Baerg Trust to utilize the bankruptcy process to unilaterally terminate the Contract merely because it thought it more profitable to keep the Properties. *See Horner v. Bourland*, 724 F.2d 1142, 1145–46 (5th Cir. 1984) (holding that specific performance was appropriate to enforce a land sale contract when the buyer had performed substantially all of its obligations under the contract and the seller wanted to revoke solely to avoid adverse tax consequences).

**Baerg Trust's Argument that Specific Performance is Unavailable**

44. The Baerg Trust argues that, based on § 101(5)(B) of the Bankruptcy Code, specific performance is not an available remedy in its bankruptcy case. Section 101(5) defines "claim" in bankruptcy. The holder of such claim must have a right to payment. § 101(5)(A). Such right need not be liquidated, reduced to judgment, or undisputed. *Id*. Subsection (B), the specific provision relied on here, states that a claim may include a right to an "equitable remedy for breach of performance if such breach gives rise to a right to payment." And, like subsection (A), such right

29

need not be fixed and liquidated at the time of the bankruptcy filing.  *Id*.  The Baerg Trust submits that Garland Solution holds, at best, an equitable remedy of specific performance that must be designated as a "claim" that is susceptible to discharge in this bankruptcy case.

45. Some courts have held that specific performance is an alternative to the legal remedy of money damages and that non-debtor parties can be forced to accept claims for money damages in bankruptcy.  *See, e.g., Route 21 Assocs. v. MHC, Inc.*, 486 B.R. 75, 85–88 (S.D.N.Y. 2012) (purchaser was not entitled to specific performance post-rejection because its claim could be monetized under § 101(5)(B)); *TKO Props., LLC v. Young (In re Young)*, 214 B.R. 905, 912 (Bankr. D. Idaho 1997) (both specific performance and monetary damages were available under Idaho law for breach of a contract to sell real property, so the buyer had a claim under § 101(5)).  These cases, however, address specific performance primarily in the context of a rejection of an executory contract under § 365(g), which does not apply here.  The argument that specific performance falls within the purview of § 101(5)(B) and can be monetized must be distinguished here.  This suit involves a two-party dispute with strong indicia that the bankruptcy was filed for the sole purpose of evading performance.

46. The legislative history to § 101(5)(B) explains that the definition of a "claim" under § 101(5)

> adopts an even broader definition of claim than is found in the [pre-1978] debtor rehabilitation chapters.  The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.  The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment.  By this broadest possible definition and by the use of the term throughout the title 11 . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.  It permits the broadest possible relief in the bankruptcy court.

S. Rep. No. 95-989, at 21–22 (1978).

47. Further, § 101(5)(B)

> is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim' for purposes of a proceeding under title 11.

124 Cong. Rec. 32393 (1978) (remarks of Rep. Edwards); *see also Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 116 (5th Cir. 1993) (analyzing the text of § 101(5)(B) that indicates a "claim" includes right to equitable remedy for breach of performance of contract if breach gives rise to right to payment).

48. It appears that Congress intended to generally include specific performance as a "claim" under § 101(5)(B).

49. The Supreme Court's decision in *Ohio v. Kovacs*, 469 U.S. 274, 280 (1985), supports the notion that § 101(5)(B) is to be defined broadly to include specific performance of a contract. In its opinion, the Court emphasized the aforementioned legislative history and affirmed the courts below in finding that the equitable remedy that required the debtor to comply with a state court injunction to remove hazardous waste was a "debt" or "liability on a claim" subject to discharge. *Id*. at 280–81.

50. *Kovacs* dealt with dischargeability of a claim under § 727. The Supreme Court premised its holding on the fact that "[w]hat the receiver wanted from respondent after bankruptcy was the *money* to defray cleanup costs." *Id*. at 283 (emphasis added). Thus the Court made the clear distinction that the relief sought was monetary damages. Here Garland Solution seeks specific performance rather than damages. As such, *Kovacs* and the legislative history serve as dicta, and specific performance should be enforced rather than converted to a "claim" under § 101(5)(B).

51. Specific performance is available here because (i) the Contract is not executory and thus cannot be rejected by the Baerg Trust; (ii) Texas law allows specific performance related to real

property;[8] and (iii) this is a two-party dispute, and the sale of the sole bankruptcy asset to anyone other than Garland Solution harms only Garland Solution.

52. Bankruptcy courts in Texas have held that the "right to payment" held by a non-debtor "does not exist separately and distinctly from the equitable relief sought such that one is discharged while the other remains." *In re Ruth*, No. 10-50184, 2013 WL 139265, at *5 n.32 (Bankr. E.D. Tex. Jan. 10, 2013). "The 'right to payment' as contemplated by the definition under § 101(5)(B) is what makes the otherwise non-dischargeable equitable remedy dischargeable." *Id.* (citing *In re Kilpatrick*, 160 B.R. 560, 567 (Bankr. E.D. Mich. 1993)); *see also In re Am. Standard Energy, Corp.*, No. 15-70104-TMD, 2017 WL 3405511, at *4 (Bankr. W.D. Tex. Aug. 8, 2017).

53. The Fifth Circuit in *In re Davis* declined to define "claim" broadly under § 101(5)(B) and, instead, found that remedies of resulting trust, partition in kind, deed reformation, appointment of receiver, and dissolution of partnership (ordered by state court) were not, collectively, a dischargeable "claim." *Davis*, 3 F.3d at 116–17.

54. According to *Davis*,

> [t]he ability of a debtor to choose between performance and damages in some cases is not the same as a debtor's liability for money damages for failing to satisfy an equitable obligation. *While section 101(5)(B) encourages creditors to select money damages from among alternative remedies, it does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages.*

*Davis*, 3 F.3d at 116 (citation omitted) (emphasis added). *See also In re Am. Standard Energy, Corp.*, No. 15-70104-TMD, 2017 WL 3405511, at *4, *6 (Bankr. W.D. Tex. Aug. 8, 2017) (finding that a "restrictive covenant that creates a non-monetary obligation that attaches to a property interest is not a 'claim' under the Bankruptcy Code" and a "right to reconveyance could also be characterized as a *right to specific performance*, which is also not a claim because damages are not an adequate alternative.") (emphasis added); *In re Indian River Estates, Inc.*, 293 B.R. 429, 434

---

[8] *See, e.g., Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559 (Tex. App.—Fort Worth 2008, pet. denied).

(Bankr. N.D. Ohio 2003) (a party should not be required to "accept a monetary alternative if it is clearly not in proportion to the equitable remedy"); *Maids Int'l, Inc. v. Ward (In re Ward)*, 194 B.R. 703, 710–11 (Bankr. D. Mass. 1996) (discussing why it can be difficult to say a remedy at law should substitute for a remedy at equity); *Beeter v. Tri-City Prop. Mgmt. Servs., Inc. (In re Beeter)*, 173 B.R. 108, 122–23 (Bankr. W.D. Tex. 1994) (finding that obligations under covenants that run with the land are not "claims" under § 101(5)(B)).

55. Specific performance may be appropriate under § 105(a) to enforce a settlement agreement concerning a contract for the sale of land. *Stokes v. Firestone (In re Stokes)*, 198 B.R. 168, 175 (E.D. Va. 1996). While *Stokes* was in the context of a settlement agreement, the reasoning provided in the analysis is persuasive. The court explained that bankruptcy courts have injunctive powers, including the power to issue a decree of specific performance of a contract under § 105(a). The court thus held that enforcing the parties to perform under the contract was necessary under the facts, explaining that

> [w]hen the contract sought to be enforced . . . has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a defendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension, or mistake, relief will be granted by specific performance.

*Id*. at 179–80.

56. To reiterate, it would be inequitable to permit the Baerg Trust to evade the Contract to Garland Solution's detriment. The Baerg Trust had no justifiable reason for terminating the Contract, and Garland Solution stands a significant loss if the deal does not close and it is instead left with only a general unsecured claim in the bankruptcy.

57. While the *timing* of the bankruptcy filing here was influenced by the pending foreclosure of the Properties by M&T Realty (for Fannie Mae), the *purpose* of the filing was to afford the Baerg Trust the time and opportunity needed to litigate the claims in this suit. Hal Baerg used the

33

bankruptcy system and used its protections to circumvent the Baerg Trust's obligation to close. Hal Baerg and the Baerg Trust did not, and do not, want to close; he wants the Baerg Trust to keep the Properties given their increased value and the potential adverse tax consequences to him upon a sale.

58. The substance of the Baerg Trust bankruptcy case is this lawsuit, which suit concerns a single asset, such asset being the Properties that are subject of this lawsuit. The Baerg Trust, by Hal Baerg, is not attempting to reorganize its affairs. It effectively relinquished operations upon signing the Contract. Both this suit and the bankruptcy case were filed to benefit Hal Baerg personally. There are few unsecured creditors, all of which hold nominal claims when compared to what Garland Solution will lose if the Contract is not enforced. In accordance with the Contract, Garland Solution satisfied the outstanding payables that the Baerg Trust had accrued; Garland Solution invested hundreds of thousands of dollars into the Properties for repairs and maintenance. Garland Solution's involvement and investment in the Properties from February 2014 to July 1, 2016 helped preserve and enhance the value of the Properties. And it did so as a way, in large measure, to accommodate Hal Baerg and the Baerg Trust. By early July 2016, Garland Solution attempted again to appease Hal Baerg for the Baerg Trust in order to salvage the closing. In response, Hal Baerg refused to cooperate and proceeded to intentionally scuttle the deal. Specific performance is the appropriate remedy here for the Baerg Trust's actions.

59. Generally, damages are available as alternative remedy only when specific performance is not sought or is not available. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 575 (Tex. App.—Fort Worth 2008, pet. denied). The general rule does not, however, prevent the court from ordering payment of expenses incurred by the prevailing party as a result of the breaching party's late or non-performance. *Id.* ("This compensation is not considered breach of contract damages, but rather 'equalizes any losses occasioned by the delay by offsetting them with money

payments.'") (quoting *Heritage Housing Corp. v. Ferguson*, 674 S.W.2d 363, 366 (Tex. App.—

Dallas 1984, writ ref'd n.r.e.)); *see Goldman v. Olmstead*, 414 S.W.3d 346, 361–62 (Tex. App.—

Dallas 2013, pet. denied) (describing when courts are allowed to award incidental monetary

compensation in addition to specific performance because "the contract is being enforced

retrospectively and the equities adjusted accordingly") (internal quotation and citation omitted).

Such incidental compensation can include items such as "rents, profits, delay costs, and like items."

*Id.* at 362 (internal quotation and citation omitted).

### Order of Specific Performance

60. By the Contract, upon closing, Garland Solution must pay the "Cash Portion of the Purchase

Price," the then-payoff amount of the Loans, the balance of the "Settlement Amount," and certify its

forgiveness of the amount owing on the "Note," i.e., the Draw Down Promissory Note. Garland

Solution may credit against the Cash Portion the Baerg Trust's $25,000 required buyback of the 1%

Trust Interest. For the Cash Portion, Garland Solution requests that the sum of $450,000 of its

escrow payments be credited against the $1,616,577 cash portion. The Court approves this request.

Garland Solution may credit against the Cash Portion the loan application fees of $34,000, its

forfeited rate-lock fees, and the additional interest accrued on the M&T Loans from July 31, 2016 to

the closing.[9]

61. The Court also approves Garland Solution's request that the original principal amount of the

Draw Down Promissory Note constitute the amount forgiven. The evidence supports this request.

Garland Solution contributed, either to the Properties directly or to the escrow accounts, at least

---

[9] The parties referred to the fact that M&T Realty (Fannie Mae) had, upon maturity of the Loans, started charging a default rate of interest and swept an account that was holding insurance proceeds for the Properties. They did not, however, direct the Court to any evidence of *when* each of the events occurred or of the exact amount that was in the account (and thus credited against the balance due on the Loans).

$927,740.48 in excess of the amount of funds provided for in the Contract.[10] To make this determination, the Court reviewed the bank statements associated with the following accounts: Escrow I, Escrow II, Escrow III, Garland Solution LLC, Lake Bluff checking (2 accounts) and savings, Lakeview Village checking and savings, Oakway Manor checking and savings, and The Woods checking and savings.[11] Because the amount contributed by Garland Solution exceeds $898,500, the Court finds it appropriate to forgive the face value of the Construction Note ($898,500) as requested by Garland Solution.

62. The Baerg Trust shall provide the instruments required for closing as set forth in the Contract.

63. If requested in writing by the Baerg Trust, Garland Solution shall confirm the status of its financing for closing but is not required to provide copies of any loan commitments. With reasonable notice, Garland Solution may designate a substitute title company and a substitute title escrow agent.

64. Garland Solution shall have sixty days from entry of a judgment here to close the deal. The Court will entertain a request for additional time for cause shown.

65. The Contract is hereby incorporated by reference and shall likewise be incorporated by reference in any judgment entered under these findings and conclusions.

66. Except as specifically directed here, the terms of the Contract shall control and apply to the closing of the sale.

---

[10] Per the terms of the Contract and the Unsecured Promissory Note, Garland Solution was required to remit a total of $675,100, which is calculated as follows:
1. Earnest Money = $550,000
2. Unsecured Promissory Note = $100,000
3. Price for 1% Trust Interest = $25,000
4. Independent Consideration = $100

[11] Exs. EE-1–EE-13. Each property account is styled as Class A Management LLC and designated by a "dba" bearing the property's name.

67. Garland Solution may, within thirty days of entry of the judgment, submit its request for attorney's fees by sworn application.  The Baerg Trust may, within twenty days after such application is filed, file a response to the application.  To the extent M&T Realty (or Fannie Mae) seeks recovery of attorney's fees under § 506 as part of the payoff on the Loans, it too shall file its application within the same timeframe, of which counsel for Garland Solution shall provide notice.

### Other Matters

68. Further, any issues with accounting or breaches of the Escrow Agreements by Garland Solution, Class A Management, or Fontana did not result in any damages to the Baerg Trust.

69. The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Memorandum Opinion ###